O

# United States District Court
# Central District of California

| | |
|---|---|
| GERARDO CABANILLAS,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY OF SOUTH GATE et al.,<br><br>    Defendants. | Case № 2:24-cv-08027-ODW (BFMx)<br><br>**ORDER GRANTING DEFENDANT CITY OF SOUTH GATE'S MOTION TO DISMISS COUNT VI [121]** |

## I. INTRODUCTION

Plaintiff Gerardo Cabanillas brings this civil rights action against Defendants City of South Gate ("South Gate"), City of Huntington Park ("Huntington Park"), and individual officers Lee Jack Alirez, David Pixler, Jonathan Sekiya, Detective Lopez, Officer Ayestas, Officer Salcido, John Navarrette, Cosme Lozano, and Anthony Porter, following Cabanillas's wrongful arrest and conviction for crimes he did not commit. (First Am. Compl. ("FAC"), ECF No. 104.) South Gate now moves to dismiss Count VI of Cabanillas's First Amended Complaint for *Monell* liability under 42 U.S.C. § 1983. (Mot. Dismiss ("Mot." or "Motion"), ECF No. 121.) For the reasons discussed below, the Court **GRANTS** South Gate's Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND[2]

Cabanillas was eighteen years old when he was arrested and imprisoned for crimes he did not commit. (FAC ¶¶ 1, 40.) On January 16, 1995, Raul Flores and Maria A. were sitting in Flores' parked car in South Gate when two men approached, demanding their valuables at knife- and gunpoint. (*Id.* ¶¶ 22–27.) The two men then drove Maria A. to an abandoned house nearby and sexually assaulted her. (*Id.* ¶¶ 29–32.) On January 18, in the same general area, Ricardo Sanchez and Maria Lomeli were sitting in a parked car when a man wearing red pants, a black leather jacket, and huarache sandals robbed them at gunpoint. (*Id.* ¶¶ 33–39.) South Gate police officers Alirez, Pixler, Sekiya, Lopez, Ayestas, and Salcido investigated both crimes under the supervision of Sergeant Martin Vanlierop. (*Id.* ¶¶ 48–50.) In the days following, officers showed the victims of both attacks a photo array of possible suspects, but no one made a positive identification. (*Id.* ¶¶ 59, 70, 72.)

On January 20, with few leads, Officer Alirez saw Cabanillas standing on a street corner in South Gate wearing red pants, which matched the description of the January 18 attacker. (*Id.* ¶¶ 75–77.) Alirez arrested him for an outstanding traffic warrant. (*Id.* ¶ 81.) He subsequently included Cabanillas's booking photo in a photo array with five other suspects who he knew the South Gate victims had already seen. (*Id.* ¶¶ 83–84.) When presented with the photo array, Sanchez and Lomeli (after some hesitation) identified Cabanillas as their attacker. (*Id.* ¶¶ 85–93.) Officers pressured and misled Flores and Maria A. into identifying Cabanillas in a similar photo array, despite their hesitation and objections. (*Id.* ¶¶ 128–34, 137–40.)

After Cabanillas's arrest, Alirez used coercive tactics to extract a false confession, including interrogating him in English, which was not his first language; lying to him about the existence of incriminating evidence; and promising that "if he confessed to the crimes against both couples, police would immediately release [him]

---

[2] All factual references derive from Plaintiff's First Amended Complaint or attached exhibits, unless otherwise noted, and well-pleaded factual allegations are accepted as true for purposes of this Motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

on probation." (*Id.* ¶¶ 101–05.) After several hours of interrogation, Cabanillas agreed to confess. (*Id.* ¶ 106.) Officers then supplied him with information about the crimes, took him to one of the crime scenes, and then coached him into recording a suitable confession. (*Id.* ¶¶ 107–13.)

In February 1995, while Cabanillas was in police custody, "a spree of strikingly similar crimes occurred" in South Gate, including in Huntington Park. (*Id.* ¶¶ 147–49, 150.) The South Gate police officers, now joined by Huntington Park detectives Lozano, Porter, and Navarrette, investigated these crimes and arrested Juan Jose Angulo after victims of those attacks positively identified him. (*Id.* ¶¶ 151–55, 159, 161.) When officers searched his house, they found "numerous stolen items, including watches and jewelry," as well as red pants, a leather jacket, and huarache sandals matching Lomeli's description of her attacker. (*Id.* ¶ 166.) Angulo, unlike Cabanillas, also matched the composite sketch based on Sanchez's and Lomeli's descriptions. (*Id.*)

After arresting Angulo, South Gate police officers "continued their framing of" Cabanillas by withholding exculpatory evidence obtained from the Angulo investigation, writing police reports with "fabricated accounts of all their major investigative steps," and eliding their use of "manufactured" photo array identifications. (*Id.* ¶¶ 167–68, 144–45, 176.) As a result, Cabanillas was convicted of several crimes associated with the two January attacks, including carjacking, robbery, kidnapping, and rape. (*Id.* ¶¶ 177–79.) He was sentenced to eighty-seven years to life in prison. (*Id.* ¶ 182.)

Cabanillas alleges that South Gate police officers, including Officer Alirez, had engaged in similar misconduct in the past. (*Id.* ¶ 251.) He cites a memorandum dated March 16, 1995, from a Deputy Public Defender to the Deputy in Charge of South Gate, explaining that "Alirez had developed a reputation among local attorneys . . . for being the detective who 'always had a confession.'" (*Id.*) He further alleges that

"several individuals accused of crimes reported being coerced into a confession with promises of leniency." (*Id.*)

In 2021, after new DNA testing, Cabanillas was excluded as a contributor to the DNA obtained from Maria A.'s sexual assault. (*Id.* ¶¶ 185–86.) In 2023, Angulo confessed to the crimes against Sanchez and Lomeli, and "credibly identified the perpetrators of the crimes against Flores and Maria A." (*Id.* ¶ 189.) As a result, on September 21, 2023, the court granted Cabanillas's habeas petition, releasing him from wrongful incarceration after more than twenty-five years. (*Id.* ¶¶ 190–91.)

On September 19, 2024, Cabanillas initiated this action. (Compl., ECF No. 1.) On February 14, 2025, Cabanillas filed the operative First Amended Complaint against Defendants.[3] (FAC.) He asserts six causes of action under 42 U.S.C. § 1983: (1) due process violations under the Fourteenth Amendment, (2) coerced false confession in violation of the Fifth and Fourteenth Amendments, (3) malicious prosecution and unlawful detention in violation of the Fifth and Fourteenth Amendments, (4) failure to intervene, (5) conspiracy, and (6) municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). (*Id.* ¶¶ 198–254.) He also pleads state law claims for (7) intentional infliction of emotional distress, (8) civil conspiracy, (9) Bane Act violations, (10) respondeat superior, and (11) indemnification. (*Id.* ¶¶ 255–282.)

South Gate now moves to dismiss Count VI for failure to state a claim. (Mot.) The Motion is fully briefed. (Opp'n, ECF No. 125; Reply, ECF No. 126.)

### III.  LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading

---

[3] Detective Gregory Wells, Sergeant Martin Vanlierop, Sergeant Sullivan, and Officer Reyes of the South Gate Police Department, and Carl Heintz of the Huntington Park Police Department were dropped or dismissed from the lawsuit. (*See* FAC; Order Granting Dismissal, ECF No. 124.)

requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Where a district court grants a motion to dismiss, it should generally provide leave to amend unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Thus, leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

## IV.    DISCUSSION

The Supreme Court has ruled that "[a] municipality may be held liable as a 'person' under 42 U.S.C. § 1983 when it maintains a policy or custom that causes the deprivation of a plaintiff's federally protected rights." *Park v. City & County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (citing *Monell*, 436 U.S. at 694).

However, liability is limited to actions taken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers," such that the policy is considered the "moving force" behind the alleged violation. *Monell*, 436 U.S. at 690, 694. Consequently, "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691 (emphasis omitted).

There is no heightened pleading standard for *Monell* claims. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993). The Ninth Circuit analyzes the adequacy of *Monell* claims under the following standard:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).

In his First Amended Complaint, Cabanillas alleges four theories of municipal liability for violations of his constitutional rights, based on (1) an official written policy; (2) a longstanding custom or practice; (3) failure to train; and (4) ratification by a final policymaker. (FAC ¶¶ 240–54; Opp'n 5.) In its Motion, South Gate argues that Cabanillas does not plausibly plead any of these theories.

**A.    Official Policy or Widespread Custom/Practice**

Cabanillas alleges that South Gate "promulgated policy, including written policies and unwritten customs, that caused [his] wrongful conviction," and identifies five general areas where existing policies were inadequate:

> (1) the conduct of interrogations and questioning of criminal suspects and witnesses; (2) the collection, documentation, preservation, testing, and disclosure of evidence . . . ; (3) writing police reports and taking investigative notes; . . . (4) intervention to prevent and redress

misconduct by other officers; and (5) maintaining investigative files and disclosing those files in criminal proceedings.

(FAC ¶¶ 240, 242.)

A plaintiff may establish municipal liability by showing that "the [municipality] had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he suffered." *Galen v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007). To state a claim based on official policy or longstanding custom, a plaintiff must plausibly allege: "(1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (cleaned up).

### 1. Official Policy

Cabanillas first alleges that South Gate "promulgated . . . written policies" that caused his wrongful conviction. (FAC ¶ 240.)

A municipality may be held liable for "an expressly adopted official policy" that causes the injury in question. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013). Cabanillas contends that he plausibly alleges "written policies" because he "identifies deficiencies in South Gate's written policies concerning the five areas" discussed above and alleges that "the lack of adequate policies" caused his constitutional violations. (Opp'n 8; FAC ¶ 242.) However, he fails to identify any specific policy or written rule that caused the violations. (*See generally* FAC.) Without identifying a specific written policy and how its deficiencies caused the constitutional violations at issue, Cabanillas fails to plead a plausible claim for relief. *See Capp v. County of San Diego*, 940 F.3d 1046, 1061 (9th Cir. 2019) ("[E]ven if [p]laintiffs had pleaded a plausible Fourth Amendment claim, the [complaint] ascribes [d]efendants' alleged misconduct to official policy in a conclusory fashion that is insufficient to state a viable claim."); *Santa Ana Police Officers Ass'n v. City of Santa*

1 *Ana*, No. 8:15-cv-01280-DOC (DFMx), 2015 WL 13757346, at *7 (C.D. Cal. Dec. 2, 2015) (finding the plaintiff's claim based on official policy was not viable because the plaintiffs did not identify "a specific 'official policy,' related to either the [c]ity or [p]olice [d]epartment, that gave rise to their claims.").

Cabanillas has therefore failed to plausibly plead a *Monell* claim based on official written policy.

*2. Widespread Custom or Practice*

In addition to official policy, Cabanillas alleges that South Gate had unofficial customs and practices that resulted in violations of his constitutional rights. (FAC ¶¶ 240–41, 246–50.) South Gate argues that Cabanillas fails to demonstrate a pattern of similar violations establishing that it had notice of the alleged unconstitutional practices. (Mot. 16–19.)

A plaintiff may assert municipal liability based on "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotation marks omitted). The existence of an informal policy can be shown with allegations of "repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see, e.g.*, *Perryman v. City of Pittsburg*, 545 F. Supp. 3d 796, 800–02 (N.D. Cal. 2021) (finding that plaintiff plausibly pleaded a "custom or practice" where he identified the specific customs responsible for his rights violations and cited ten lawsuits against the police department involving similar facts).

For example, in *Brown v. County of San Bernardino*, the court found that the plaintiff did not plead sufficient facts to establish that a widespread custom or practice

1  existed.  No. 5:20-cv-01304-JGB (SHKx), 2021 WL 99722, at *4 (C.D. Cal. Jan. 8, 2021).  In her complaint, the plaintiff alleged that several of the county police force's customs, including "using excessive force and providing inadequate training regarding the use of force," caused her injury.  *Id.* (cleaned up).  The court deemed these allegations "overbroad and conclusory," noting that "[c]ourts have repeatedly rejected sweeping allegations of policies and customs in the absence of facts supporting their existence and applicability."  *Id.* (collecting cases); *see, e.g.*, *Moore v. City of Orange*, No. 8:17-cv-01024-JVS (JCGx), 2017 WL 10518114, at *3 (C.D. Cal. Sept. 25, 2017) (holding that "a speculative list of various customs, policies, and practices" employed by county law enforcement was inadequate without "specific factual allegations" to support the claim).  The court in *Brown* also found the plaintiff's "cursory references to prior shootings . . . . far from sufficient to establish a widespread practice or custom," because the plaintiff "fail[ed] to explain what happened, when, who was involved, any similarities to the facts here, or the [d]efendants' subsequent actions."  2021 WL 99722, at *5.  As a result, the plaintiff did not demonstrate that the defendant municipality had sufficient notice of the incidents to support a viable claim under the custom or practice theory.  *Id.*

Similarly, here, Cabanillas has not alleged sufficient facts to support a *Monell* claim based on widespread custom or practice.  Cabanillas alleges that the South Gate police department maintained unofficial policies allowing the kinds of misconduct to which he was subjected, including "pursuing convictions without regard to the truth, through reliance on profoundly flawed investigations," coercing suspects to "implicate themselves in crimes they did not commit," "deliberately cover[ing] up their wrongful and illegal misconduct and assist[ing] each other in doing so," and "shirk[ing] their sworn duty to follow leads and conduct honest investigations."  (FAC ¶¶ 241, 246–47.)  As in *Brown* and *Moore*, these allegations are overbroad, conclusory, and lack sufficient detail.  Without additional factual allegations as to the existence of these

9

policies and how South Gate police officers carried them out as a department-wide practice, Cabanillas fails to meet the pleading standard.

Cabanillas also fails to allege a pattern of similar misconduct establishing that South Gate was deliberately indifferent to the alleged custom. He alleges two facts in support of his contention that municipal officials were "well aware of the persistent problem of officers coercing confessions," and thus indifferent to it. (*Id.* ¶ 251.) The first is a memo from a Deputy Public Defender to the Deputy in Charge of South Gate's police department, "explain[ing] that Defendant Alirez had developed a reputation among local attorneys . . . for being the detective who 'always had a confession.'" (*Id.*; *see* Opp'n 13.) The second is a vague assertion that "several individuals accused of crimes reported being coerced into a confession with promises of leniency." (FAC ¶ 251.) Neither of these allegations is sufficient to state a *Monell* claim. As in *Brown*, Cabanillas makes only "cursory references" to previous coerced confessions involving South Gate police officers, without identifying which officers were involved, who was coerced, what the coerced individuals were accused of, or where they "reported" the misconduct. Similarly, Cabanillas does not name the individual who received the Deputy Public Defender's vaguely accusatory memo, identify his or her role, or describe the conduct Alirez was accused of committing in sufficient detail to support an inference of deliberate indifference. Cabanillas also fails to allege how the unknown deputy's knowledge of Alirez's reputation can be attributed more broadly to the South Gate police department to show the municipality knew of the complaints.

Absent additional allegations supporting the existence of these policies and South Gate's awareness of them, Cabanillas has not plausibly stated a claim based on unofficial custom or practice.

**B.    Failure to Train**

Cabanillas also alleges liability based on a failure-to-train theory. (*Id.* ¶ 253; Opp'n 5, 7, 10–11.) South Gate contends Cabanillas does not plausibly plead a

10

*Monell* claim because he does not identify the specific training deficiencies at issue or demonstrate South Gate's deliberate indifference. (Mot. 19–22; Reply 4–6.)

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Under this theory, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." *Id.* at 62 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)). However, the Supreme Court has "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference," in circumstances where "the unconstitutional consequences of failing to train [are] so patently obvious" that the city can be held liable based on a "single[]incident" without establishing a "pre-existing pattern of violations." *Id.* at 63–64, 71 (quoting *Bryan Cnty.*, 520 U.S. at 409). A need for training could be considered "obvious" in recurrent situations where it is "highly predictable" that "an officer lacking specific tools to handle that situation will violate citizens' rights." *Bryan Cnty.*, 520 U.S. at 409–410.

In *City of Canton, Ohio v. Harris*, the Supreme Court offered the example of the obvious need to train law enforcement in the constitutional limits on the use of force, which officers regularly encounter and are not presumed to know unless specifically informed. 489 U.S. 378, 390 n.10 (1989). Conversely, in *Connick*, the Supreme Court found that the municipality's alleged failure to provide adequate training to prosecutors regarding *Brady* violations did not fit the "single-incident" exception for a "patently obvious" failure to train. 563 U.S. at 62–69, 71. There, the plaintiff relied on four prior convictions overturned for *Brady* violations to show that prosecutors had a pattern of misconduct of withholding potentially exculpatory evidence. *Id.* at 62–63. However, the Court found that none of the cited cases had sufficiently similar facts to suggest that officials had notice of training deficiencies of the kind the plaintiff alleged. *Id.* The Court also found the claim did not fit the

narrow exception for "patently obvious" training deficiencies because the plaintiff alleged that prosecutors had inadequate *Brady* training, rather than complete ignorance of the rules. *Id.* at 64, 67. Whereas the *Canton* hypothetical assumed that officers had "no knowledge at all of the constitutional limits on the use of deadly force," the prosecutors in *Connick* were "familiar with the general *Brady* rule." *Id.* at 67. As a result, the plaintiff in *Connick* could only "assert that prosecutors were not trained about particular *Brady* evidence or the specific scenario related to the violation in his case," which was too nuanced an argument to support a "patently obvious" failure to train theory. *Id.*; *see Canton*, 489 U.S. at 392 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").

With respect to the existence of deficient policies, Cabanillas asserts that he "identifies the deficient or challenged policies and explains how they were deficient." (Opp'n 4–5.). But he does not cite, and the Court is unable to locate, any allegations in the First Amended Complaint identifying the specific training practices at issue, which aspects of the training were deficient, or how those deficiencies caused Cabanillas's harm. (*See generally* FAC.) For example, while Cabanillas alleges that South Gate "failed to implement adequate training and supervision of their police officers with respect to . . . the collection, documentation, preservation, testing, and disclosure of evidence," he does not identify any specific inadequacy in those practices that plausibly caused his injuries. (*See* FAC ¶ 243.) Accordingly, Cabanillas has not alleged that his constitutional violations were the result of a policy or custom, rather than the individual choices or conduct of the officers, which would otherwise improperly place the claim within the ambit of respondeat superior. *See Canton*, 489 U.S. at 379 (observing that "[t]o adopt lesser standards of fault and causation . . . would engage federal courts in an endless exercise of second-guessing municipal employee-training programs").

Moreover, for the reasons discussed above, Cabanillas has not established a pattern of similar misconduct that would have placed South Gate on notice of any training deficiencies. It therefore appears his failure-to-train theory rests on the argument that the alleged deficiencies were so obvious that no pattern of misconduct is needed to establish deliberate indifference. To the extent that Cabanillas does identify the basis for his "patently obvious" failure to train theory, his claim is more akin to *Connick*'s inadequate *Brady* training than *Canton*'s deadly force training example. He argues his injuries were caused by "gaps and deficiencies" in South Gate's training policies and "fail[ure] to implement adequate training," rather than a complete failure to train officers in the specified areas. (Opp'n 5; *see* FAC ¶ 243.) As the Supreme Court noted in *Connick*, an allegation that training was provided but deficient in a particular respect cannot support the theory that more or better training is "obviously" needed to prevent constitutional violations that are otherwise likely to result. 563 U.S. at 68, 71; *cf. Perez v. City of Fresno*, 98 F.4th 919, 932 (9th Cir. 2024) (finding the district court properly granted summary judgment on a failure to train claim where some of the involved officers received adequate training while others did not, which was insufficient to show that the need for more training was patently obvious). Therefore, without more facts demonstrating the alleged training deficiencies and South Gate's awareness of them, Cabanillas fails to plausibly allege a *Monell* claim under a "failure to train claim" theory.

### C. Ratification By a Final Policymaker

Cabanillas also asserts a claim based on ratification by a final policymaking official. (FAC ¶¶ 250, 252–53; Opp'n 5, 11–12.) South Gate argues that Cabanillas has not identified a final policymaker with notice of the violations or any acts of ratification. (Mot. 12–15; Reply 8–9.)

A municipality may also be held liable under § 1983 when "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette*, 979 F.2d at 1346–47. "The key question in

determining whether a person is 'a final policymaker' is whether 'he or she [is] in a position of authority such that a final decision by that person may appropriately be attributed to the [m]unicipality.'" *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1097 (E.D. Cal. 2012) (first alteration in original) (quoting *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004)). "Heads of local departments do not automatically act with final policymaking authority." *Santa Ana Police*, 2015 WL 13757346, at *8 (citing *Gillette*, 979 F.2d at 1350). Courts may evaluate "local charters, ordinances, and policies to determine where final policymaking authority lies." *Id.* at *8 (citing *Christie v. Iopa*, 176 F.3d 1231, 1237 (9th Cir. 1999)). For liability to attach, "[t]he policymaker must have knowledge of the constitutional violation and actually approve of it," *Lytle*, 382 F.3d at 987, by making "a deliberate choice from among various alternatives to follow a particular course of action," *Gillette*, 979 F.2d at 1348. "A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle*, 382 F.3d at 987.

Here, Cabanillas claims that officers violated his rights "with the knowledge, approval, or endorsement of persons with final policymaking authority" for South Gate. (FAC ¶ 252.) He alleges that final policymakers ratified the officers' misconduct by "continuing to employ them, promote them, and approve of their work" on the investigations that led to Cabanillas's wrongful conviction, rather than correcting their actions through discipline or training. (*Id.* ¶ 253.) In the Opposition, Cabanillas specifically focuses on Sergeant Vanlierop as a final policymaker, alleging that he was aware and "approved of his subordinates' acts of misconduct" in his role as department supervisor, including their decisions to "extract involuntary statements, coerce eyewitness identifications, falsify evidence implicating Plaintiff, and suppress exculpatory evidence." (Opp'n 7–8.) In the First Amended Complaint, Cabanillas alleges that, as supervisor, Vanlierop "participated in the day-to-day investigation himself," in addition to overseeing it; "was responsible for ensuring that investigative information was reported and transmitted to state criminal prosecutors and to criminal

defense attorneys"; "kept himself apprised of all evidence collected in the case"; and continued his supervisory role, including all relevant duties, in the subsequent joint investigation with the Huntington Park Police Department. (FAC ¶¶ 50–53, 152, 156–58.) However, Vanlierop's adherence to these duties does not show his awareness of the officers' constitutional violations, which include procuring false witness identifications, fabricating statements, concealing exculpatory evidence, falsifying police reports, and coercing a false confession. (*Id.* ¶¶ 200–01, 203–04, 212.) Absent a showing that Vanlierop was aware of the officers' misconduct and its unconstitutional basis, Vanlierop's failure to overrule or discipline the officers cannot be interpreted as an act of ratification.

Even if Cabanillas plausibly alleges that Vanlierop knew and approved of the officers' misconduct, he does not adequately allege—such as by citing municipal ordinance or police department policy—that Vanlierop, or any other South Gate supervisor, acted with the requisite authority as a policymaker "whose decisions represent the official policy of the local government." *Christie*, 176 F.3d at 1235. *See, e.g.*, *Santa Ana Police*, 2015 WL 13757346, at *8 (finding that plaintiff did not plausibly allege police chief was a final policymaker because plaintiff did not cite "any charter, municipal code, ordinance, or other enactment" other than a recent job description). Nor does Cabanillas plausibly allege that any other unnamed supervisor knew and approved of the officers' actions. (*See generally* FAC.) Cabanillas must provide additional factual allegations to proceed with a ratification theory. *See, e.g.*, *Lucero v. County of Orange*, 536 F. Supp. 3d 628, 633 n.2 (C.D. Cal. 2021) (rejecting ratification theory where the plaintiff "fail[ed] to identify a policymaker or articulate any facts surrounding the circumstances of ratification, including when or how it occurred" (cleaned up)). Without alleging *how* Vanlierop or unnamed officials knew about and ratified the constitutional violations, Cabanillas fails to plausibly allege a *Monell* claim based on a ratification theory.

Given that Cabanillas does not meet the pleading standard under any of his alleged theories of liability under *Monell*—official policy, widespread custom or practice, failure to train, and ratification—the Court **DISMISSES** his Sixth Cause of Action. South Gate has not shown that "amendment would be futile," *Carrico*, 656 F.3d at 1008, so this dismissal is **with leave to amend**.

## V.  CONCLUSION

For the reasons discussed above, the Court **GRANTS** South Gate's Motion to Dismiss. (ECF No. 121.) Accordingly, the Court **DISMISSES** Cabanillas's sixth cause of action against South Gate **WITH LEAVE TO AMEND** to add factual allegations consistent with the challenged pleading to cure the above noted deficiencies.

If Cabanillas chooses to amend, he must file his Second Amended Complaint no later than **fourteen (14) days** from the date of this Order, in which case Defendants shall answer or otherwise respond within **fourteen (14) days** of the filing. If Cabanillas does not timely amend, this dismissal shall be deemed a dismissal with prejudice as to the sixth cause of action against South Gate, as of the lapse of the deadline to amend.

**IT IS SO ORDERED.**

August 8, 2025

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**